WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Elizabeth S. Gonzales,<br><br>                    Plaintiff,<br><br>v.<br><br>Carolyn W. Colvin, Acting Commissioner of Social Security,<br><br>                    Defendant. | No. CV 14-2579-TUC-BPV<br><br>**ORDER** |

Plaintiff Elizabeth Gonzales filed the instant action pursuant to 42 U.S.C. § 405(g) seeking review of the final decision of the Commissioner of Social Security. Pursuant to 28 U.S.C. § 636(c), the parties have consented to proceed before the Magistrate Judge for all proceedings in this case. (Doc. 14). Pending before the Court are Plaintiff's Brief (Doc. 19), Defendant's Brief (Doc. 23), and Plaintiff's Reply Brief (Doc. 24). For the following reasons, the Court remands the matter for further proceedings.

**I.   PROCEDURAL HISTORY**

In March 2012, Plaintiff filed applications for disability benefits and supplemental security income under the Social Security Act. (Doc. 19 at 2; Transcript/Administrative Record (Doc. 16) ("Tr.") at 35; *see also* Tr. at 167-74). Plaintiff alleges that she has been unable to work since June 30, 2010 due to arthritis of both knees, varicose veins, and hammer toes. (Tr. at 169, 215, 219). After Plaintiff's applications were denied initially

and upon reconsideration, she requested a hearing before an Administrative Law Judge ("ALJ"). (Doc. 19, at 2). On July 23, 2013, the matter came on for hearing before ALJ Normal Buls where Plaintiff, who was represented by counsel, testified. (Tr. at 17-31). On August 21, 2013, the ALJ issued an unfavorable decision. (Tr. at 35-41). The Appeals Council subsequently denied Plaintiff's request for review, thereby rendering the ALJ's August 21, 2013 decision the final decision of the Commissioner. (Tr. at 1-5). Plaintiff then initiated the instant action.

## II.   THE RECORD ON APPEAL

### A.   PLAINTIFF'S BACKGROUND AND STATEMENTS IN THE RECORD

Plaintiff was born on August 27, 1956[1]. (Tr. at 20, 167, 169). She is five feet, three inches tall and, on the date of the hearing, she weighed 254 pounds. (Tr. at 20). She graduated from high school and completed two years of college. (*Id.*). Plaintiff worked as a teacher's aide[2] from 1999 until she was laid off in 2010. (Tr. at 22-23, 220). Additionally, since 2004 through the date of the hearing before the ALJ, Plaintiff has also worked an average of two hours per week as a merchandiser for a greeting card company, which requires her to go to a store to sort greeting cards and put them in order. (Tr. at 21, 220). From October 2011 to February 2012, Plaintiff also worked as a tutor, one hour per day, three days a week. (Tr. at 220).

Plaintiff testified that her work as a teacher's aide was terminated due to budget cuts. (Tr. at 23). By the time she stopped working as a teacher's aide, she was "already having problems going up steps. I cannot do steps." (*Id.*; *see also* Tr. at 30). She also has difficulty standing and walking for too long due to her knees. (Tr. at 23; *see also* Tr.

---

[1] Defendant states that Plaintiff was born in 1961. (Doc. 23 at 3 (citing Tr. at 20, 167, 169)). However, the documents cited by Defendant indicate Plaintiff was born on August 27, 1956. (Tr. at 20, 167, 169).

[2] Plaintiff stated that her work as a teacher's aide required her to climb and descend stairs and to "stand for most classes and walk[] around[]", and also escort students to other classrooms. (Tr. at 230, 232). Plaintiff also stated that she worked for six hours per day and her job involved: walking for three hours, although it "varies; standing for 2 hours, although it "varies"; sitting for approximately 30 minutes, although it "varies"; and climbing stairs for about thirty minutes, although that time "varies", as well. (*Id.*). She was not required to stoop, kneel, crouch, or crawl. (*Id.*).

at 30 (Plaintiff has difficulty walking long distances); Tr. at 27 (Plaintiff's varicose veins also interfere with her ability to stand)).  When the ALJ asked Plaintiff how long she can stand, Plaintiff responded that she could stand for "[n]o more than an hour and a half or two hours" before needing to sit down and rest for a while.  (Tr. at 23-24).  She also testified that after standing 40 minutes, she has to sit down and take a 10-15 minute break before being able to stand up and walk around again because her varicose veins "start getting numb—tingling on the side of my left leg. . . . And my knees start to hurt."  (Tr. at 27).  Plaintiff stated that she would be unable to work as a merchandiser full-time because she would not be able to "stand that long."  (Tr. at 25).  Further, in her current work two hours a week as a merchandiser, she has difficulty walking around the store and she must hold onto a cart or use a cane because her knees buckle and she loses her balance.  (Tr. at 26 (Plaintiff began using a cane on her own)).  Plaintiff also experiences numbness in her left thigh from varicose veins when sitting longer than 20 minutes at a time, so she has to get up.  (Tr. at 28).  Plaintiff also experiences pain at the left side of her back and in her hip.  (Tr. at 28-29).

Plaintiff testified that she has not "gone often to a doctor because I don't have money or insurance to get more physical facts."  (Tr. at 23).  Plaintiff's statements to medical providers also reflect that cost and lack of insurance affected her ability to obtain medical care.  (*See e.g.,* Tr. at 297 (In October 2010, Plaintiff told Dr. Ellinas that "'I am unemployed so I don't have money so I didn't come when I was supposed to.  I didn't get anything done.'"); Tr. at 332 (In April 2010, Plaintiff stated to Dr. Ellinas that she didn't "come when I was supposed to…" because she is unemployed and has no money.); Tr. at 293 (Dr. Ellinas noted in March 2011 that Plaintiff was "still on Synthroid 'it had refills' but otherwise no insurance to pay for meds"); Tr. at 347 (In February 2013, Plaintiff told Dr. Ellinas that she did not do follow up lab work because she was sent a "big bill", and Dr. Ellinas' treatment note also reflects: "If  manages to get insurance she will need Vascular referral."); Tr. at 332 (In February 2013, Dr. Ellinas wrote a note "to whom it may concern" requesting Plaintiff be provided with "health insurance as patient has

1  chronic medical issues that need immediate workup by orthopedic and vascular surgery
2  specialists")).  Plaintiff also testified that she has not undergone treatment for varicose
3  veins because she does not have insurance, and she has not had treatment for back and
4  hip pain because "the doctors have to refer me to other doctors, and I don't have the
5  money."  (Tr. at 28-29).

6  Plaintiff testified that is she divorced and lives with her son who helps her with
7  laundry, cleaning the house and cooking.  (Tr. at 20-24; *see also* Tr. at 29 (Plaintiff does
8  not stand for long periods when cooking)).  Plaintiff stated that it takes her about two
9  hours to do laundry on her own, with three 15-minute rest periods.  (Tr. at 227).  She can
10 vacuum, sweep, mop and dust for about one and one-half hours with three 15-minute rest
11 periods.  (*Id.*).  Plaintiff never learned to drive, so she uses a shuttle bus, or her daughter
12 or sister will drive her places.  (Tr. at 21, 24, 227).

13 In addition to medication for high blood pressure, hypothyroidism, and acid reflux,
14 Plaintiff also takes 800 mg ibuprofen and Cyclobenzaprine for pain, including muscle
15 pain.  (Tr. at 243, 287).

**B.   PERTINENT MEDICAL OPINIONS**

  **1.   TREATING PHYSICIANS**

18 The record reflects that Plaintiff was treated by Doctors Karam Makhni and
19 Panayoitis Ellinas, both of Copper Queen Medical Associates.  November 2012
20 radiological examination of Plaintiff's knees, ordered by Dr. Makhni, reflected moderate
21 bicompartmental narrowing and early degenerative changes bilaterally.  (Tr. at 309).
22 Imaging performed in December 2012 revealed mild degenerative changes in both knees
23 and no acute abnormalities in Plaintiff's right foot, although mild hallux valgus was
24 noted.  (Tr. at 320-23).

25 The record contains Dr. Makhni's undated "Medical Opinion Re:  Ability To Do
26 Physical Activities" reflecting his diagnosis of osteoarthritis in both knees and indicating
27 that Plaintiff's prognosis was "good to fair with physical therapy."  (Tr. at 314) (all
28 capitalization omitted).  Dr. Makhni opined that Plaintiff could sit continuously for 2

hours at a time, and she could sit at least 6 hours during an 8-hour workday, with normal breaks. (*Id.*). He also stated that Plaintiff could walk up to 2 city blocks without rest, but would need a cane if she walked a greater distance. (Tr. at 315). Plaintiff could stand continuously for 45 minutes, and she could stand for a total of 2 hours during an 8-hour workday, with normal breaks. (Tr. at 314). He indicated that Plaintiff needed to shift positions at will from sitting, standing or walking, and that she would need to take unscheduled breaks, lasting about 10 minutes each, once every hour. (*Id.*). Plaintiff could occasionally twist and stoop but she should never crouch, climb stairs, or ladders. (Tr. at 316). The record also reflects an April 2010 note from Dr. Ellinas that Plaintiff should "limit ANY climbing stairs due to severe knee disease." (Tr. at 331) (emphasis in original).

### 2.    EXAMINING DR. HASSMAN

In August 2012, Plaintiff presented to consulting examiner Jeri Hassman, M.D. (Tr. at 300-06). Plaintiff, who is five feet, three inches weighed 255 pounds on the day of the appointment. (Tr. at 301). On examination, Dr. Hassman noted, in pertinent part, that Plaintiff's "gait was essentially normal." (Tr. at 301). Plaintiff "had slight difficulty with toe walking because of pain in her toes, and she complained of 'hammertoes.'" (*Id.*). Plaintiff "refused to hop on either foot because of bilateral knee pain." (*Id.*). She bent down to pick something up from the floor in a "slightly unusual way" in a lunge-type position keeping her right knee in flexion and bending forward from the waist. (*Id.*). She was unable to kneel completely. (*Id.*). Plaintiff had "full range of motion of both knees but slight pain and stiffness with range of motion of both knees, left worse than right." (Tr. at 302). There was no specific medial or lateral joint tenderness and no "varus or valgus or anterior or posterior instability of the knees. She had a negative McMurray sign of both knees." (*Id.*) There was minimal crepitus in both knees. (*Id.*). Dr. Hassman also noted moderate varicosities in both claves. (*Id.*). On examining Plaintiff's feet, Dr. Hassman found "a bunion of the left foot but minimal hallux valgus...." (*Id.*). Plaintiff also had "hammering and fixed flexion of the interphalangeal

joint of bilateral second toes but no obvious hammering of the third, fourth, and fifth toes bilaterally. She was able to stand on both feet in bare feet without any complaints of pain in her feet." (*Id.*).

> Dr. Hassman's diagnoses included:
> 1. Probably degenerative joint disease, both knees, left slightly more symptomatic than right. She had minimal crepitus in both knees but full range of motion and no instability and a negative McMurray sign.
> 2. Moderate varicosities, both calves.
> 3. Morbid obesity.
> 4. Mild to moderate bunion and hallux valgus, left foot, with hammering both feet, mostly involving bilateral second toes.

(Tr. at 302-03)). Dr. Hassman completed a "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" indicating that Plaintiff's conditions were expected to impose limitations for 12 continuous months. (Tr. at 303) (all capitalization omitted). Dr. Hassman opined that Plaintiff could lift/carry up to 50 pounds occasionally and 25 pounds frequently. She stated that Plaintiff could stand and/or walk at least 6 to 8 hours in an 8-hour day, and she went on to state: "She may need to take a rest break at least every hour." (*Id.*). As support for the recommended limitations on standing and walking, Dr. Hassman cited Plaintiffs "[p]robable degenerative joint disease, both knees[]" and "complaints of bilateral foot pain, and she does have hammering of bilateral second toes both a bunion on the left foot." (*Id.*). Dr. Hassman indicated that Plaintiff was unlimited in sitting. (*Id.*). She further stated that Plaintiff was limited to occasional: climbing of ramps, ladders, stairs, ropes and scaffolds; stooping; kneeling; crouching; and crawling. (Tr. at 305).

### III.   THE ALJ'S DECISION

#### A.   CLAIM EVALUATION

Whether a claimant is disabled is determined pursuant to a five-step sequential process. See 20 C.F.R. §§404.1520, 416.920. To establish disability, the claimant must show that: (1) she has not performed substantial gainful activity since the alleged disability onset date ("Step One"); (2) she has a severe impairment(s) ("Step Two"); and (3) her impairment(s) meets or equals the listed impairment(s) ("Step Three"). "If the

claimant satisfies these three steps, then the claimant is disabled and entitled to benefits. If the claimant has a severe impairment that does not meet or equal the severity of one of the ailments listed…, the ALJ then proceeds to step four, which requires the ALJ to determine the claimant's residual functioning capacity (RFC)."[3] *Dominguez,* 808 F.3d at 405. "After developing the RFC, the ALJ must determine whether the claimant can perform past relevant work…. If not, then at step five, the government has the burden of showing that the claimant could perform other work existing in significant numbers in the national economy given the claimant's RFC, age, education, and work experience." *Id*.

### B.     The ALJ's Findings in Pertinent Part

The ALJ determined that Plaintiff had the following severe impairments:  arthritis of the bilateral knees.  (Tr. at 37).  To support this determination, the ALJ stated that "[t]he medical evidence of record documents that the claimant exhibits symptoms that are consistent with degenerative joint disease of her bilateral knees, with the left slightly more symptomatic than the right….The claimant reported chronic pain and difficulty climbing stairs."  (Tr. 38).

The ALJ found that Plaintiff's impairments did not meet a listing.  (*Id.*).  He found that Plaintiff had the RFC to:

> perform medium work as defined in 20 CFR [§] 404.1567(c) and 416.967(c)[4] except that [she] may only occasionally climb ramps or stairs, or ladders, ropes or scaffolds.  The Claimant may only occasionally stoop, kneel, crouch or crawl.

(*Id.*).  Based upon Plaintiff's RFC, the ALJ found that Plaintiff "is capable of performing past relevant work as a teacher's aide[,]" as that work is actually and generally performed. (Tr. at 41).  Therefore, the ALJ determined that Plaintiff is not disabled under the Social Security Act from June 30, 2010 through the date of his decision.  (*Id.*).  In

---

[3] "The RFC is defined as 'the most' the claimant can do, despite any limitations." *Dominguez v. Colvin*, 808 F.3d 403, 405 (9th Cir. 2015), *as amended* (Feb. 5, 2016) (citation omitted).

[4] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. §§ 404.1567(c); 416.927(c).

making his determination, the ALJ gave "controlling weight" to examining Dr. Hassman's opinion and "reduced weight" to treating Dr. Makhni's opinion. (Tr. at 40).

## IV. DISCUSSION

Plaintiff argues that the ALJ erred by (1) assigning "controlling weight" to examining Dr. Hassman's opinion, but then failing to accept all of the doctor's limitations; (2) failing to consider the impact of Plaintiff's obesity; and (3) improperly rejecting the opinion of Plaintiff's treating doctor. Defendant counters that the ALJ's decision was free of error on all matters at issue and, even if error did occur, it was harmless.

### A. STANDARD

The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Tackett*, 180 F.3d at 1098. Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)). Moreover, the Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case

accordingly. *Matney,* 981 F.2d at 1019. However, the Commissioner's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett,* 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir.1998)). Rather, the Court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (*quoting Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

### B.   THE ALJ'S RFC ASSESSMENT

Plaintiff argues that the ALJ's RFC assessment is unsupported by substantial evidence because the ALJ failed to include that Plaintiff may need to take breaks every hour as stated by examining doctor Hassman.

The ALJ is responsible for determining the claimant's RFC. *See* 20 C.F.R. § 404.1546(c), 416.946(c); SSR 96-5p, 1996 WL 3474183[5]. Plaintiff's RFC is the most that she can do considering her impairments and limitations. *See* 20 C.F.R. § 404.1545, 416.945; Social Security Ruling ("SSR") 96-8p, 1996 WL 374184. The ALJ gave Dr. Hassman's opinion "controlling weight."[6] (Tr. at 40). The parties agree that the ALJ's RFC assessment incorporated the limitations assessed by Dr. Hassman except for the statement that Plaintiff "may need to take a rest break at least every hour." (Tr. at 304; Doc. 19, at 5; Doc. 23 at p.8).

When discussing Dr. Hassman's examination of Plaintiff and opinion in detail, the ALJ stated in pertinent part that Dr. Hassman "opined that the claimant would be able to stand or walk for six to eight hours total out of an eight-hour workday, *with breaks every hour.*" (Tr. at 39) (emphasis added). Defendant posits that the ALJ "misstated" Dr.

---

[5] SSRs "do not carry the force of law, but they are binding on ALJs nonetheless. They reflect the official interpretation of the [Social Security Administration] and are entitled to some deference as long as they are consistent with the Social Security Act and regulations." *Molina v. Astrue,* 674 F.3d 1104, 1114 n.5 (9th Cir. 2012) (internal quotation marks and citations omitted).

[6] Plaintiff points out that "[t]echnically, the opinion of a consultative examiner cannot be accorded 'controlling weight'; under the regulations, only a treating source's opinion is eligible to be assigned such weight. 20 C.F.R. § 404.1527(c)(2). Plainly, however, the ALJ intended to assign [Dr. Hassman's] opinion dispositive weight." (Doc. 19 at 3 n.1).

- 9 -

Hassman's restriction with regard to the breaks. (Doc. 23 at 8). According to Defendant, "Dr. Hassman's opinion about the need to take an hourly rest break was equivocal . . .", and "the ALJ reasonably excluded this equivocal limitation from the residual functional capacity, although he did not expressly note this." (*Id.*). Defendant also argues that the omission was inconsequential to the nondisability determination and, thus, was harmless. (*Id.* (citing *Molina,* 674 F.3d at 1115)).

There is simply no basis to believe that the ALJ did not read Dr. Hassman's assessment the way the ALJ said he did. Significantly, Dr. Hassman was careful to include this specific restriction in her statement of Plaintiff's "Ability To Do Work-Related Activities (Physical)" (Tr. at 303) (all capitalization omitted), and noted as support: probable degenerative joint disease in both knees; bilateral foot pain; hammering of bilateral second toes both; and a bunion on Plaintiff's left foot. (Tr. at 304). *Cf. Valentine v. Comm'r. of Soc. Sec. Admin*, 574 F.3d 685, 691-92 (9th Cir. 2009) (where a doctor observed that the plaintiff may need simple paced work, in addition to other non-exertional restrictions, but did not include those restriction in the Mental Residual Functional Capacity Assessment, the ALJ did not err by excluding the recommended restrictions from the RFC assessment). That Dr. Hassman used the word "may" does not necessarily mean equivocation; instead, the word can suggest that the need to rest was at Plaintiff's will during each hour. In any event, the ALJ's discussion of Dr. Hassman's assessed limitations supports the conclusion that he read the statement that Plaintiff was capable of standing or walking "for six to eight hours total out of an eight-hour workday, with breaks every hour." (Tr. at 39). The ALJ was clear that he gave Dr. Hassman's assessment "controlling weight", yet he did not account for omitting the necessity of hourly breaks in the RFC assessment. *See Lester v. Chater,* 81 F.3d 821, 830-31 (9th Cir. 1995) (to reject an examining doctor's uncontroverted opinion, the ALJ must state clear and convincing reasons; and to reject an examining doctor's opinion that is contradicted, the ALJ must state specific and legitimate reasons[7]). Assuming *arguendo* that substantial

---

[7] Arguably, Dr. Hassman's opinion about breaks is in line with treating Dr.

- 10 -

evidence supported the ALJ's adoption of Dr. Hassman's assessment in the first instance, Plaintiff is correct that the ALJ's finding on residual functional capacity was not supported by substantial evidence as it failed to account for Dr. Hassman's work tolerance finding that Plaintiff may need to take a rest break at least every hour.  The error was not harmless given the record does not conclusively reflect that the ALJ considered such a limitation when he determined that Plaintiff could perform her past work.

### C. OBESITY

Plaintiff stands 5 feet, three inches tall.  (Tr. at 301). On the day she was examined by Dr. Hassman, she weighed 255 pounds.[8]  (*Id.*; *see also* Tr. at 20 (on the date of the hearing before the ALJ, Plaintiff weighed 254 pounds)).  Dr. Hassman's diagnoses included morbid obesity.  (Tr. at 302). Plaintiff's treating physicians Drs. Makhni and Ellinas also diagnosed obesity.  (*See* Tr. at 297, 347 (chronic uncontrolled obesity); Tr. at 351 (diagnosing obesity and recommending diet and exercise including "non-weight bearing exercises . . . as an option for when walking causes too [conclusion of sentence was omitted from treatment record]")).

As discussed above, the ALJ gave Dr. Hassman's opinion what he termed "controlling weight."  (Tr. at 40).  Although the ALJ acknowledged that Dr. Hassman's diagnoses included "morbid obesity" (Tr. at 39), he omitted any further discussion related

---

Makhni's opinion that Plaintiff would need to shift positions at will once every hour, thus requiring the ALJ to state clear and convincing reasons for rejecting the opinion, which the ALJ did not do.  Even if Dr. Hassman's opinion was contradicted by Dr. Makhni, the ALJ was still required to state specific and legitimate reasons for rejecting Dr. Hassman's opinion on the issue of breaks, and he did not do so. *See Lester,* 81 F.3d at 830-31.

[8] Plaintiff asserts, and Defendant does not dispute, that her body mass index ("BMI") is 45 kg/m$^2$.  (Doc. 19 at 9).  The Social Security Administration, consistent with guidelines established by the National Institutes of Health, classifies obesity according to the BMI, which is the ratio of an individual's weight in kilograms to the square of his or her height in meters.  SSR 02-1p, 2002 WL 34686281, *2.  Under the guidelines, a person, such as Plaintiff, with a BMI equal to or greater than 40 is considered "Level III, termed 'extreme' obesity." *Id.* Level III obesity "represent[s] the greatest risk for developing obesity-related impairments." *Id.*  However, while the "levels describe the extent of obesity,. . . they do not correlate with any specific degree of functional loss." *Id.*

to that diagnosis. The ALJ did not include obesity as one of Plaintiff's severe impairments.[9] Nor did he explain his basis for concluding at Step Two that Plaintiff's obesity was not a severe impairment. Further, the ALJ did not discuss the combined effects of Plaintiff's obesity and severe impairments on her ability to work. Plaintiff argues that the ALJ's failure to consider her obesity constituted harmful error. Defendant counters there was no error, and even if there was, it was harmless.

The Social Security Administration has recognized that "[o]besity is a risk factor that increases an individual's chances of developing impairments in most body systems. It commonly leads to, and often complicates, chronic diseases of the cardiovascular system, respiratory, and musculoskeletal body systems." SSR 02-1p, 2002 WL 34686281, *3. The Administration has also recognized that even though obesity is a risk factor for other impairments, an obese individual may not "necessarily have any of these impairments." *Id.* The Administration has directed that in determining severity at Step Two, the ALJ should consider "the effects of any symptoms (such as pain or fatigue) that could limit functioning." *Id.* at *4 (noting "[t]here is no specific level of weight or BMI that equates with a 'severe' or 'not severe' impairment. . . . Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe."). SSR 01-2p, in pertinent part, also makes clear that obesity can affect the claimant's RFC assessment at Step Four:

> Obesity can cause limitation of function. The functions likely to be limited depend on many factors, including where the excess weight is carried. An

---

[9] The record reflects that Dr. Christopher Maloney, one of the doctors who reviewed Plaintiff's record prior to initial denial of her claim, found Plaintiff's obesity was severe. (Tr. at 46, 53). The determination whether an impairment or combination of impairments is severe is made at Step Two of the sequential process. Step Two "is 'a *de minimis* screening device [used] to dispose of groundless claims.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 2008) (alteration in original). "At step two, the ALJ assesses whether the claimant has a medically severe impairment or combination of impairments that significantly limits his [or her] ability to do basic work activities." *Id*. (citing 20 C.F.R. § 404.1520(a)(4)(ii)). Basic work activities include walking, standing, sitting, lifting and carrying. 20 C.F.R. §§ 404.1521(b)(1); 416.921(b)(1). "An impairment or combination of impairments may be found 'not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'" *Webb*, 433 F.3d at 686 (quoting *Smolen*, 80 F.3d at 1290).

>individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching.

*Id.* at *6. Further, it is well-settled that:
>The ALJ is required to consider all of the limitations imposed by the claimant's impairments, even those that are not severe. Social Security Ruling ("SSR") 96–8p (1996). Even though a non-severe "impairment[ ] standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." *Id*.

*Carmickle v. Comm'r. Soc. Sec. Admin.,* 533 F.3d 1155, 1164 (9th Cir. 2008); *see also Smolen,* 80 F.3d at 1290 ("[T]he ALJ must consider the combined effect of all of the claimant's impairments on her ability to function, without regard to whether each one alone was sufficiently severe.").

Defendant argues that the ALJ's decision is without error or, alternatlively, that any error is harmless because Plaintiff has failed to identify "any symptoms or limitations related to obesity, such as fatigue." (Doc. 23 at 14). Defendant's reliance on lack of evidence of "fatigue" is unpersuasive. The Administration has recognized that "pain or fatigue" can constitute symptoms for consideration at Step Two and Plaintiff has alleged pain and complained to her doctors and testified about same. SSR 02-1p, 2002 WL 34686281, *4. Additionally, Step Four considerations should take into account that "[t]he combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a *weight-bearing joint* may have more pain and limitation than might be expected from the arthritis alone." *Id.* at *6 (emphasis added).

Given that notes from Plaintiff's treating physicians, in addition to Dr. Hassman's diagnoses, referenced Plaintiff's obesity, it is troubling that the ALJ failed to state that he considered Plaintiff's obesity in the sequential analysis. Defendant states that Plaintiff has not shown any restrictions other than those stated in the ALJ's RFC assessment, that could be linked to her obesity. It is problematic here, as discussed above, that the ALJ's

- 13 -

RFC assessment omitted Dr. Hassman's work tolerance limitation that Plaintiff may need to take a rest break every hour. It may well be that the ALJ, in granting Dr. Hassman's opinion controlling weight, necessarily considered Plaintiff's obesity in light of the fact that Dr. Hassman also diagnosed obesity. Nonetheless, the Court is "constrained to review the reasons the ALJ asserts[]" for his decision. *See e.g. Connett,* 340 F.3d at 874 (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196, (1947); *Pinto v. Massanari*, 249 F.3d 840, 847–48 (9th Cir. 2001)). "It will not do for a court to be compelled to guess at the theory underlying the agency's action." *Chenery,* 332 U.S. at 196-97 (internal quotation marks and citation omitted). Moreover, the ALJ's failure to address the combined effects of Plaintiff's obesity, whether it be severe or not, on her other impairments may have also impacted his decision to reject Dr. Makhni's assessment which was more restrictive than Dr. Hassman's. It may also have affected the ALJ's assessment of Plaintiff's credibility on this point as well. On the instant record, the Court cannot say that the ALJ's failure to discuss Plaintiff's obesity in any detail at any point during his sequential analysis was inconsequential to the outcome.

### D.    THE ALJ'S REJECTION OF TREATING DR. MAKHNI'S OPINION

Plaintiff also challenges the ALJ's rejection of treating Dr. Makhni's opinion, arguing that the ALJ failed to comply with 20 C.F.R. § 404.1527. Defendant contends that the ALJ properly carried his burden in rejecting Dr. Makhni's opinion.

It is well-settled that the opinions of treating doctors are entitled to greater weight than the opinions of examining or nonexamining physicians. *Andrews v. Shalala,* 53 F.3d 1035, 1040-1041 (9th Cir. 1995). Generally, more weight is given to the opinion of a treating source than the opinion of a doctor who did not treat the claimant. *See Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1222 (9th Cir. 2010); *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987). Medical opinions and conclusions of treating doctors are accorded special weight because treating doctors are in a unique position to know claimants as individuals, and because the continuity of their dealings with claimants enhances their ability to assess the claimants' problems. *See Embrey v. Bowen*, 849 F.2d

418, 421-22 (9th Cir. 1988); *Winans*, 853 F.2d at 647; 20 C.F.R 20 § 404.1527(c)(2) (generally, more weight is given to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations …."); 20 C.F.R. §404.927 (same).

A treating physician's opinion may not be entitled to controlling weight where it is not "well-supported" or is inconsistent with other substantial evidence in the record. *Orn v. Astrue,* 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2), *recodified as* 20 C.F.R. § 404.1527(c)(2)).  In such a case, the ALJ must consider the factors outlined in the regulations for determining what weight to accord the treating physician's opinion.[10]  *Id* at 631-32; *see also* Social Security Ruling 96-2p, 1996 WL 374188, *4 ("Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a

---

[10] The factors for consideration as to the weight the opinion will be given include

> the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. [20 C.F.R.] § 404.1527(d)(2)(i)-(ii)….Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record. *Id.* § 404.1527(d)(3)-(6).

*Orn*, 495 F.3d at 631 (citing 20 C.F.R. §§ 404.1527(d)(2)(i)-(ii), 404.1527(d)(3)-(6), *recodified* as 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6)).

- 15 -

treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."). Thus, even if the treating physician's opinion does not meet the test for controlling weight, his opinion may still be entitled to the greatest weight and should be adopted. *See Orn,* 495 F.3d at 633.

Here, where Dr. Makhni's opinion is contradicted by examining Dr. Hassman, the ALJ must "provid[e] 'specific and legitimate reasons' supported by substantial evidence in the record[]" for rejecting Dr. Makhni's opinion. *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998) (citing *Lester,* 81 F.3d. at 830). "'The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings.'" *Tommasetti* 533 F.3d at 1041 (quoting *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989)).

The ALJ gave Dr. Makhni's opinion "reduced weight" because: (1) "Dr. Makhni opined that the claimant had a good prognosis for improvement with conservative treatment, indicating that he did not consider her impairment to be severe"[11]; and (2) Dr. Makhni's opinion that Plaintiff was "limited to standing for forty-five minutes at one time and to less than two hours total out of an eight-hour workday is inconsistent with the claimant's own testimony that she was able to stand for two hours at a time. . . . The undersigned notes that the claimant later changed her testimony to reflect a forty minute maximum time that she could stand."[12] (Tr. at 40). The ALJ went on to state that "even adopting [Dr. Makhni's] restrictions . . ., the claimant would still be able to work."[13]

---

[11] Dr. Makhni indicated that Plaintiff's prognosis was "good to fair with physical therapy." (Tr. at 314).

[12] The ALJ also rejected Dr. Makhni's opinion for the reason that: Dr. Makhni's "opinion that the claimant was precluded from climbing any stairs is somewhat inconsistent with the claimant's testimony that she remained able to take a bus for transportation." (Tr. 40). Defendant "does not rely on this reason [in opposing Plaintiff's argument], but asserts that the ALJ's other reasons are specific and legitimate and supported by substantial evidence." (Doc. 23 at 13 n.1)

[13] In addressing the ALJ's statement that she would still be able to work even if Dr. Makhni's restrictions applied, Plaintiff points out that adoption of Dr. Makhni's recommended restrictions would most likely require analysis of Step Five concerns that

- 16 -

(*Id.*).

In supporting the ALJ's rejection of Dr. Makhni's opinion, Defendant stresses the fact that the ALJ mentioned that Plaintiff had a good prognosis with conservative treatment. (*See* Doc. 23 at 12 (noting that Dr. Makhni prescribed ibuprofen and capsaicin for pain and indicated a steroid shot may help; *see also* Tr. 301 (noting Plaintiff had injections to her left knee twice in approximately 2007)). The ALJ omitted that if Plaintiff had insurance, she would have been referred to orthopedic and vascular surgery specialists. (*See* Tr. 332, 347). Plaintiff also testified that lack of money and insurance prevented her from going to the doctor. (*See* Tr. at 23, 28-29; *see also* Tr. at 297 (Plaintiff told Dr. Ellinas that she "didn't come when I was supposed to…" due to not having money); Tr. at 347 (Plaintiff told Dr. Ellinas that she not obtain follow-up lab work because of money issues)). Dr. Ellinas also noted that Plaintiff's lack of medical insurance precluded referrals to specialists. (*See* Tr. at 332, 347) It is not clear on the instant record to what extent Plaintiff's financial situation and lack of insurance affected her treatment options and/or the treatment she received, although it appears that with regard to Plaintiff's orthopedic, hip, back, and varicose vein issues, Plaintiff's lack of insurance prevented further follow-up and/or treatment. (*See* Tr. at 28-29, 332, 347); *Cf. Orn,* 495 F.3d at 638 (the Ninth Circuit has proscribed the rejection of a claimant's complaints for lack of treatment when the medical record establishes that the claimant could not afford it); *Gamble v. Chater,* 68 F.3d 319, 321 (9th Cir. 1995) ("Disability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds."). Further, although Dr. Makhni's prognosis discussed physical therapy, the parties have not cited any records to show that Plaintiff was referred to physical therapy or that she could afford it. Moreover, the Court finds persuasive Plaintiff's argument that Dr. Makhni's prognosis does not necessarily mean that he did

---

the ALJ did not reach and that could arguably support a disability finding. (Doc. 19 at 16-17). Plaintiff acknowledges that remand for further proceedings is appropriate for such inquiry. (Doc. 19 at 17-18). On the instant record, any analysis at Step Five should be conducted by the ALJ in the first instance. (*See id.*).

- 17 -

1  not consider her impairments to be severe or to have an impact on her tolerance for work.
2  While Dr. Makhni may not have expressly opined that Plaintiff was in fact disabled—an
3  opinion by which the ALJ would not be bound—the issue here is whether, regardless of
4  her "prognosis", Plaintiff is able to perform her past work and, if not, then other work.
5  As Plaintiff points out, the ALJ provided no explanation how the prognosis "would
6  undermine the specific functional restrictions in Dr. Makhni's medical opinion." (Doc.
7  19 at 15).

As to Plaintiff's testimony regarding her ability to stand as a basis to reject Dr. Makhni's opinion, the record reflects Plaintiff's testimony that because of her knees, standing and walking "too long[]" interferes with her ability to work. (Tr. 23). The following exchange between the ALJ and Plaintiff then occurred:

```
Q. [ALJ]:      How long can you stand?
A. [Plaintiff]: No more than an hour and a half or two hours.
Q.             And then you need to sit down for a while, rest them?
A.             Yes, sir.
```
(Tr. 23-24).

The questioning then turned to Plaintiff's daily activities. Later, Plaintiff testified as follows when questioned by her attorney:

```
Q. [counsel]  Now, earlier you stated that you can stand for one and a half
              to two hours. You can stand that long without having to sit
              down; or in between that time, do you have to sit down and
              take a break?
A. [Plaintiff]: I have to sit down, take a little break.
Q.            Okay. How long can you stand before you have to sit down
              and then take that break?
A.            Like 40 minutes.
Q.            About 40 minutes?
A.            Yeah.
Q.            Okay. What starts to happen at the 40-minute mark?
A.            I have . . . varicose veins, and they start getting numb –
              tingling on the side of my left leg. . . . And my knees start to
              hurt.
Q.            Okay. And that's even when you're using your cane, that still
              happens?
A.            Yes.
Q.             Okay. How long do you have to sit before you could get
```

- 18 -

        back up and stand up and walk around again?
A.    Like 10-15 minutes.

(Tr. 27).

   The ALJ is of the opinion that Plaintiff "changed her testimony" and, thus, Plaintiff's initial testimony that she could stand for one and one-half hours to two hours undermines Dr. Makhni's opinion that she can only stand 45 minutes continuously, and for less than two hours total in an 8-hour workday, with normal breaks. (Tr. at 40). Plaintiff contends that it is unclear from her initial exchange with the ALJ whether she was testifying about the total amount of time she could stand or, instead, about how long she could stand continuously. (Doc. 19 at 15). She asserts that counsel's follow-up questions clarified the issue. Given the imprecision of the ALJ's initial questioning, the Court cannot say that substantial evidence supports the ALJ's opinion that Plaintiff "changed her testimony" on this point. (Tr. 40).

   Consequently, for the above-stated reasons, the ALJ failed to state sufficient reasons to reject Dr. Makhni's opinion.

**V.**  **REMAND FOR FURTHER PROCEEDINGS**

   Plaintiff requests that the Court remand this matter for further proceedings. (Doc. 19 at 18; Doc. 24 at 7).

   "A district court may 'revers[e] the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing,' *Treichler v. Comm'r of Soc., Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)) (alteration in original), but 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation,' *id*. (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985))." *Dominguez,* 808 F.3d at 407. In evaluating whether further administrative proceedings would be useful, the court "consider[s] whether the record as a whole is free from conflicts, ambiguities, or gaps, whether all factual issues have been resolved, and whether the claimant's entitlement to benefits is clear under the applicable legal rules." *Treichler*,

775 F.3d at 1103-04; *see also id.* at 1101 n.5 (it is an abuse of discretion to remand "for an award of benefits when not all factual issues have been resolved.").

As discussed above, the ALJ failed to state sufficient reasons to reject Dr. Hassman's work tolerance recommendation on the issue of breaks while standing, and he failed to state sufficient reasons to reject Dr. Makhni's work tolerance recommendations, as well. Additionally, the ALJ failed to consider the impact, if any, of Plaintiff's obesity on her ability to work. Further, even if the case were to proceed to analysis at Step Five, the ALJ should address the Step-Five concerns in the first instance, and Plaintiff concedes as much. (*See* Doc. 19 at 17-18). Consequently, the matter is remanded for further proceedings. On remand, the ALJ shall reassess Plaintiff's RFC to perform work, including her ability to stand continuously. In his reassessment of the record, the ALJ should consider the impact, if any, resulting from Plaintiff's lack of insurance. On remand, the ALJ may take additional evidence, including calling upon a vocational expert if necessary.

## VI. CONCLUSION

For the foregoing reasons, the Court remands this matter for further proceedings consistent with this Order. Accordingly, IT IS ORDERED that:

(1)   the Commissioner's decision denying benefits is REVERSED; and

(2)   this matter is REMANDED to the Commissioner for further proceedings consistent with this Order.

The Clerk of Court is DIRECTED to enter Judgment accordingly and to close its file in this matter.

Dated this 29th day of September, 2016.

_____
Bernardo P. Velasco
United States Magistrate Judge